NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| JESUS VALENTIN SANTOS,<br><br>Plaintiff,<br><br>v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>Defendant. | Civil Action No. 12-7070 (JLL)<br><br>OPINION |

**LINARES**, District Judge.

Before the Court is Plaintiff Jesus Valentin Santos ("Plaintiff")'s appeal seeking review of a final determination by Administrative Law Judge ("ALJ") Michal L. Lissek denying his application for a period of disability and disability insurance benefits ("DIB"). The Court declines Plaintiff's request for oral argument and, thus, resolves this matter on the parties' briefs pursuant to Local Civil Rule 9.1(f). For the reasons below, the Court affirms in part and vacates in part the final decision of the Commissioner of Social Security (the "Commissioner") and remands for further administrative proceedings.

**I.    BACKGROUND**

   A.   Facts and Procedural History

On October 15, 2007, Plaintiff's longtime career at the Victory Box Corporation ("Victory Box") ended when the plant where he worked closed. *See* R. at 197, 215.[1] This date also marks the alleged onset of Plaintiff's disability. *Id.* at 215. Plaintiff has not worked since

---

[1] "R." refers to the pages of the Administrative Record.

then, and spends most of his days at home watching television. *Id.* at 293-94. Plaintiff speaks both English and Spanish. *Id.* at 295. However, Spanish is his main and dominant language. *Id.*

During the last three years of Plaintiff's employment at Victory Box, Plaintiff worked in the shipping department as a "labeler." *Id.* at 20. In that role, Plaintiff labeled and stamped rolls of paper that came into the plant. *Id.* To do so, Plaintiff had to walk all day. *Id.* However, he did not have to lift or carry anything. *Id.* Plaintiff also worked as a "carton forming machine operator" during his last fifteen years at Victory Box. *Id.* at 46-47. This job required Plaintiff to lift corrugated cardboard boxes off of a production line that weighed, at most, twenty pounds. *Id.* at 48.

On January 23, 2008, Plaintiff filed an application for DIB with the Social Security Administration ("SSA"). *Id.* at 192. Plaintiff alleges that he has a disability stemming from diabetes mellitus, lumbosacral and shoulder strains, and depression. *Id.* at 18-20. The SSA denied Plaintiff's application and his subsequent request for rehearing. Pl. Br. at 1. In response, Plaintiff filed a request for a hearing before an ALJ. R. at 103-04. This hearing occurred before ALJ Lissek on April 21, 2010, at the Office of Disability Adjudication and Review in Newark, New Jersey. *Id.* at 53. After reviewing the facts of Plaintiff's case, ALJ Lissek issued an unfavorable decision on May 7, 2010. *Id.* at 74.

Plaintiff sought Appeals Council review, and on April 7, 2011, the Appeals Council remanded the case for reconsideration. *Id.* at 89-90. On July 13, 2011, another hearing took place before ALJ Lissek. *Id.* at 26. Patricia Sasona, an impartial vocational expert, appeared at the hearing. *Id.* at 13. She testified that the Department of Labor's Dictionary of Occupational Titles (the "DOT") considers Plaintiff's "labeler" position as unskilled and performed at the light exertional level. *Id.* at 47. Sasona also testified that, generally, the DOT considers Plaintiff's

"carton forming machine operator" position as unskilled and performed at the medium exertional level. *Id.* However, Sasona concluded that "as [Plaintiff] described his specific job it would be a light job." *Id.* at 48.

Again, on August 4, 2011, ALJ Lissek issued an unfavorable decision, concluding that Plaintiff "ha[d] not been under a disability within the meaning of the Social Security Act." *Id.* at 7. At that time, Plaintiff was sixty-two years old. *See id.* at 211. Once more, Plaintiff sought Appeals Council review. *Id.* at 1. The Appeals Council denied Plaintiff's request on September 20, 2012. *Id.* The ALJ's decision became the Commissioner's final decision when the Appeals Council denied Plaintiff's request for review. As a result, Plaintiff appealed to this Court on November 14, 2011. Compl. at 1. The Court has jurisdiction to review this matter pursuant to 42 U.S.C. § 405(g).

B. <u>Medical Evidence for the Relevant Time Period</u>

Plaintiff alleges that he has a disability under the Social Security Act because he is afflicted with diabetes mellitus, shoulder and lumbosacral strains, and depression. A discussion of each of these conditions follows.

1. <u>Plaintiff's Diabetes Mellitus</u>

From January 2008 to June 2011, Dr. Mathew V. Cholankeril ("Dr. Cholankeril") treated Plaintiff's diabetes mellitus type I. *See* R. at 287-88, 527-28. Throughout this time, Plaintiff's diabetes mellitus was uncontrolled, as his fasting glucose levels remained high. *See id.* at 287, 508, 510, 512, 514, 516, 518, 520, 530, 533, 535, 537. To treat Plaintiff's condition, Dr. Cholankeril prescribed Plaintiff Levemir, Metformin, and other medications. *See id.* at 285, 383, 449, 451, 453, 455, 506, 508, 527, 529, 532, 534, 536. Dr. Cholankeril also advised Plaintiff to follow the American Diabetic Association's low-carbohydrate diet. *See id.* at 384, 507, 528-30,

533, 535. Plaintiff did not adhere closely to this diet. *See id.* Likewise, Plaintiff admitted that he did not always take his diabetes mellitus medications. *Id.* at 37-38.

In spite of Plaintiff's diabetes mellitus and other health problems, Dr. Cholankeril opined in a January 2008 report that Plaintiff could lift and carry fifty pounds, and that he had no limitations on his ability to sit, stand, or walk. *Id.* at 284. In the same report, however, Dr. Mathew Cholankeril opined that Plaintiff had limitations on his ability to push and pull. *Id.* Notably, the medical records available do not suggest that Plaintiff's diabetes mellitus caused other complications, such as end-organ damage or the need for frequent hospital visitations. *See id.* at 265-537.

2. <u>Plaintiff's Shoulder and Lumbosacral Strains</u>

On January 11, 2008, Dr. Morris Horwitz diagnosed Plaintiff with repetitive stress and strain injuries in both of his shoulders in a report that he prepared in connection with a then pending New Jersey workers' compensation proceeding. *See id.* at 317-18. The report noted that neither of Plaintiff's shoulders moved smoothly. *Id.* at 318. Plaintiff's "[right] [s]houlder motion lack[ed] 20 degrees in elevation, 15 degrees in external rotation and 15 degrees in internal rotation . . . ." *Id.* Similarly, Plaintiff's "[left] [s]houlder motion lack[ed] 20 degrees in elevation, 10 degrees in external rotation and 10 degrees in internal rotation . . . ." *Id.* The record suggests that these shoulder injuries caused Plaintiff some pain. In response to Plaintiff's complaints of acute pain in his left shoulder, on March 18, 2009, Dr. Cholankeril injected Plaintiff's joint with Solu-Medrol. *Id.* at 455. Dr. Cholankeril also prescribed Mobic, an anti-inflammatory drug, to Plaintiff at that time. *Id.* at 456. The record suggests that Plaintiff used Mobic only for a limited time since Dr. Cholankeril did not list Mobic as one of Plaintiff's

4

current medications in any subsequent reports. *See id.* at 383-84, 449-54, 506-09, 527-530, 532-37.

Dr. Horwitz also diagnosed Plaintiff with repetitive stress and strain injuries in his lumbosacral region that limited his motion. *Id.* at 318. An MRI study Dr. John Cholankeril performed on Plaintiff on March 21, 2008, further confirmed this diagnosis. *Id.* at 290. The MRI study noted that Plaintiff had "degenerative disc changes and [a] disc bulge . . . with a small subligamentous central disc herniation with mild neural foraminal narrowing" at the L4-L5 level. *Id.* The MRI study also noted that Plaintiff had a "mild disc bulge with degenerative changes of the intervertebral disc and mild neural foraminal narrowing" at the L5-S1 level. *Id.* Dr. Horwitz and Dr. John Cholankeril's findings conflict with those made by Dr. Sam Mayerfield in an earlier examination conducted on January 8, 2008. *Id.* at 270. In said examination, Dr. Mayerfield concluded that Plaintiff's lumbar spine was "normal." *Id.* Plaintiff used Ibuprofen to deal with his back pain. *See id.* at 218-19, 294.

The record reaches different conclusions as to the effect of Plaintiff's shoulder and lumbosacral strains on his ability to work. On the one hand, Plaintiff alleged in his disability report that he could lift up to twenty pounds and that his injuries limited his ability to sit and stand. *Id.* at 215. Consistent with said report, on January 28, 2008, Dr. Cholankeril opined that Plaintiff's injuries limited his ability to push or pull. *See id.* at 284.

On the other hand, Dr. Cholankeril also opined on said date that Plaintiff could lift up to fifty pounds and that his injuries did not limit his ability to sit, stand, or walk. *Id.* Moreover, Dr. Cholankeril's reports suggest that Plaintiff had no musculoskeletal issues from March 2009 to June 2011. *See id.* at 383-84, 449-54, 506-09, 527-530, 532-37. Some of these reports state that Plaintiff had "[n]o deformities, no joint tenderness, [and] normal muscle tone and strength," *id.*

5

at 383-84, 449-52, while others simply state that Plaintiff had "[n]o muscle pain or swelling." *Id.* at 506-09, 527-530, 532-37. There is also no evidence suggesting that Plaintiff's shoulder and lumbosacral strains resulted in hospitalization or a protracted course of physical therapy. *See id.* at 285-88, 383-84, 449-56, 506-09, 527-530, 532-37.

3.  Plaintiff's Depression

On May 6, 2008, Dr. Ernesto L. Perdomo, a licensed psychologist, met with Plaintiff to perform a complete mental status evaluation at the request of the New Jersey Division of Disability Determination. *See id.* at 293-97. Dr. Perdomo described Plaintiff as "somewhat tearful" at the time. *Id.* at 295. Dr. Perdomo noted that Plaintiff "reported feelings of sadness, lack of interest, lack of motivation, no desire, crying spells, irritability, lack of appetite, and difficultly sleeping all secondary to loss of his jobs and medical problems." *Id.* Plaintiff also reported that he did not socialize, wanted to be left alone, and sometimes heard a voice calling his name. *Id.* at 293. Ultimately, Dr. Perdomo concluded that Plaintiff had "developed a recurrent major depression of moderate to mild intensity but [that] his main problems [were] medical." Dr. Perdomo assigned Plaintiff a Global Assessment of Functioning ("GAF") rating of seventy to seventy-five.[2] *Id.* at 296.

In reaching these conclusions, Dr. Perdomo noted that Plaintiff's "mood and affect was depressed." *Id.* at 295. Dr. Perdomo also noted that Plaintiff was "oriented to time, place and

---

[2] The GAF Scale ranges from zero to one-hundred. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. text rev. 2000) (hereinafter DSM-IV-TR). An individual's "GAF rating is within a particular decile if *either* the symptom severity or the level of functioning falls within the range." *Id.* at 32. "[I]n situations where the individual's symptom severity and level of functioning are discordant, the final GAF rating always reflects the worse of the two." *Id.* at 33. "In most instances, ratings on the GAF Scale should be for the current period (*i.e.*, the level of functioning at the time of the evaluation) because ratings of current functioning will generally reflect the need for treatment or care." *Id.* A GAF rating of sixty-one to seventy indicates that an individual has "[s]ome mild symptoms," *e.g.*, a "depressed mood and mild insomnia," or "some difficulty in social, occupational, or school functioning . . ., but generally function[s] pretty well, [and] has some meaningful interpersonal relationships." *Id.* at 34. A GAF rating of seventy-one to eighty indicates that "[i]f symptoms are present, they are transient and expectable reactions to psychological stressors," or that an individual has "no more than slight impairment in social occupational, or school functioning." *Id.*

person," his "thought process was well organized and focused, and he "spoke coherently and relevantly." *Id.* Additionally, there were "no indications of any thought disorder or psychosis," and Plaintiff "denied any hallucinations and [elicited] no delusions . . . ." *Id.* Accordingly to Dr. Perdomo, Plaintiff's short-term memory was "fair," his long-term memory and concentration were "good," and his association and abstraction abilities were "concrete." *Id.* When Plaintiff met with Dr. Perdomo, Plaintiff took Lexapro once a day to treat his depression. *Id.* at 294.

From July 2008 to June 2011, the Trinitas Hospital Department of Behavioral Health and Psychiatry ("Trinitas") treated Plaintiff's depression. *See id.* at 331-41, 500. When Trinitas began seeing Plaintiff in July 2008, it noted the following about Plaintiff's mental status. Plaintiff had a full orientation, impaired memory, intact general knowledge, poor concentration, limited impulse control, and fair judgment and insight. *Id.* at 339. Further, Plaintiff had mildly impaired social skills, moderately impaired community living skills, and seriously impaired vocational functioning. *Id.* at 340. Plaintiff was also depressed, had homicidal and suicidal ideations, and had a suicidal plan. *Id.* at 338-39. Ultimately, Trinitas assigned Plaintiff a GAF rating of fifty at that time.[3] *Id.* at 341. Trinitas assigned Plaintiff the same GAF rating in September 2008. *Id.* at 329-30.

From September 2008 until February 2009, Trinitas noted that Plaintiff did not have any suicidal or homicidal ideations or plans. *See id.* at 324-25, 329-30. Throughout this time, Trinitas described Plaintiff's depression as "mild" in most of its reports. *See id.* at 324-25. According to Trinitas, Plaintiff had "vague" suicidal ideations in March and April 2009. *Id.* at 405-06. However, Trinitas reported that Plaintiff had no such ideations from May to August 2009. *Id.* at 395-96, 428. "Vague" suicidal thoughts returned to Plaintiff in September 2009 and

---

[3] A GAF rating of forty-one to fifty indicates that an individual has either "[s]erious symptoms," *e.g.*, "suicidal ideation," or "serious impairment in social, occupational, or school functioning . . . ." DSM-IV-TR 34.

7

lasted until at least November 2009. *Id.* at 400-01. The psychiatric drug management notes prepared by Trinitas from January 29, 2010, to May 4, 2010, indicate that Plaintiff did not have any suicidal or homicidal ideations or plans. *Id.* at 488-89.

Shortly thereafter, on May 20, 2010, Trinitas Regional Medical Center admitted Plaintiff with depressive symptoms and suicidal ideation, assigning Plaintiff a GAF rating of twenty-five.[4] *Id.* at 471, 477. Trinitas discharged Plaintiff five days later on May 25, 2010. *Id.* at 471. Both Plaintiff's discharge summary and a psychiatric evaluation performed by Trinitas while Plaintiff was an inpatient state that "financial stressors" contributed to Plaintiff's suicidal ideations and plan. *See id.* at 471, 481. Plaintiff's discharge summary also noted that "[o]nce [he] was taking medication, his symptoms were much improved. His affect was appropriate. He was smiling appropriately, was participating in the groups and was also interacting with peers and staff appropriately." *Id.* at 471. Trinitas assigned Plaintiff a GAF rating of sixty at the time of discharge.[5] *Id.* at 472.

From June 2, 2010, to June 29, 2011, the psychiatric drug management notes prepared by Trinitas state that Plaintiff did not have any suicidal or homicidal ideations or plans. *Id.* at 487, 500-01, 504-05. Many of these notes describe Plaintiff's depression as "mild." *See id.* at 500-01, 504-05.

## II. LEGAL STANDARD

### A. The Five-Step Process for Evaluating Whether a Claimant Has a Disability

---

[4] A GAF rating of twenty-one to thirty indicates that an individual's "[b]ehavior is considerably influenced by delusions or hallucinations," or "serious impairment in communication or judgment," *e.g.*, "suicidal preoccupation," or "inability to function in almost all areas . . . ." DSM-IV-TR 34.

[5] A GAF rating of fifty-one to sixty indicates that an individual has "[m]oderate symptoms," *e.g.*, "flat affect and circumstantial speech, [or] occasional panic attacks," or "moderate difficulty in social, occupational, or school functioning . . . ." DSM-IV-TR 34.

8

Under the Social Security Act, the SSA is authorized to pay DIB to persons who have a "disability." 42 U.S.C. § 423(a). A "disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A). A person is unable to engage in substantial gainful activity when his physical or mental impairments are "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

Regulations promulgated under the Social Security Act establish a five-step process for determining whether a claimant is disabled. 20 C.F.R. § 404.1520(a)(1). At step one, the ALJ assesses whether the claimant is currently performing substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). If so, the claimant is not disabled and, thus, the process ends. *Id.* If not, the ALJ proceeds to step two and determines whether the claimant has a "severe" physical or mental impairment or combination of impairments. 20 C.F.R. § 404.1520(a)(4)(ii). Absent such impairment, the claimant is not disabled. *Id.* Conversely, if the claimant has such impairment, the ALJ proceeds to step three. *Id.* At step three, the ALJ evaluates whether the claimant's severe impairment either meets or equals a listed impairment. 20 C.F.R. § 404.1520(a)(4)(iii). If so, the claimant is disabled. *Id.* Otherwise, the ALJ moves on to step four, which involves three sub-steps:

> (1) the ALJ must make specific findings of fact as to the claimant's residual functional capacity [("RFC")]; (2) the ALJ must make findings of the physical and mental demands of the claimant's past relevant work; and (3) the ALJ must compare the [RFC] to the past relevant work to determine whether claimant has the level of capability needed to perform the past relevant work.

*Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 120 (3d Cir. 2000) (citations omitted). The claimant is not disabled if his RFC allows him to perform his past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). However, if the claimant's RFC prevents him from doing so, the ALJ proceeds to the fifth and final step of the process. *Id.*

The claimant bears the burden of proof for steps one, two, and four. *Sykes v. Apfel*, 228 F.3d 259, 263 (3d Cir. 2000). Neither side bears the burden of proof for step three because "step three involves a conclusive presumption based on the listings . . . ." *Id.* at 263 n. 2 (citing *Bowen v. Yuckert*, 482 U.S. 137, 146-47 n. 5, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987)). The ALJ bears the burden of proof for the final step. *See id.* at 263. The final step requires the ALJ to "show [that] there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and [RFC]." *Plummer v. Apfel*, 186 F.3d 422, 428 (3d Cir. 1999). In doing so, the ALJ "must analyze the cumulative effect of all the claimant's impairments in determining whether she is capable of performing work and is not disabled." *Id.* (citing 20 C.F.R. § 404.1523). Notably, the ALJ typically seeks the assistance of a vocational expert at this final step. *Id.* (citation omitted).

B. The Standard of Review: "Substantial Evidence"

This Court must affirm an ALJ's decision if it is supported by substantial evidence. *See* 42 U.S.C. §§ 405(g), 1383(c)(3). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206 83 L.Ed. 126 (1938)). To determine whether an ALJ's decision is supported by substantial evidence, this Court must

review the evidence in its totality. *Daring v. Heckler*, 727 F.2d 64, 70 (3d Cir. 1984). However, this Court may not "weigh the evidence or substitute its conclusions for those of the fact-finder." *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992) (citation omitted). Consequently, this Court may not set an ALJ's decision aside, "even if [it] would have decided the factual inquiry differently." *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999) (citations omitted).

## III. DISCUSSION

After applying the five-step process to Plaintiff's claim, the ALJ concluded that Plaintiff "has not been under a disability within the meaning of the Social Security Act." R. at 14. At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity from the alleged onset date through the date of decision. *Id.* at 15. At step two, the ALJ found that Plaintiff's diabetes mellitus, lumbosacral and shoulder strains, and depression were severe impairments. *Id.* at 15. At step three, the ALJ found that these severe impairments neither met nor medically equaled the severity of a listed impairment. *Id.* at 16. At step four, the ALJ found that, despite Plaintiff's severe impairments, Plaintiff had the RFC to perform light work with the following limitations:

> [Plaintiff] is limited to work that can be learned in [one] month or less and that involves simple instructions. He is limited to work that involves no contact with the general public. He can work in proximity with co-workers, but cannot work with them. He can have contact with supervisors up to [one-third] of the day.

R. at 17. The ALJ then concluded that this RFC allowed Plaintiff to perform his past relevant work as a carton forming machine operator and labeler in a shipping department. *Id.* at 20-21. Consequently, the ALJ did not reach step five.

The crux of Plaintiff's appeal to this Court is that the ALJ's decisional RFC at step four is not based on substantial evidence.[6] Plaintiff alleges that this is so because the ALJ's mistreatment of the record led to erroneous findings and conclusions concerning Plaintiff's: (1) diabetes mellitus; (2) shoulder and lumbosacral strains; and (3) depression. The Commissioner responds that "[t]he ALJ properly identified the medically-supported work-related limitations caused by Plaintiff's diabetes, lumbosacral and shoulder strain, and depression." Def. Br. at 7. The Court will consider each of Plaintiff's arguments in turn.

   A.   Plaintiff's Diabetes Mellitus

Plaintiff contends that the ALJ's decision to attribute no specific restrictions resulting from Plaintiff's diabetes mellitus lacked substantial evidence because the ALJ based her decision solely on Plaintiff's noncompliance with his medication. *See* Pl. Br. at 13. Plaintiff's contention lacks merit. The ALJ based said decision, *in part*, on Plaintiff's "admitted non-compliance with the anti-diabetic diet and exercise instructions of his treating physician." R. at 18. The ALJ further noted that "there [was] no medical evidence . . . of any secondary diabetes related complications in the form of target, end-organ damage, or the need for [hospitalization.]" *Id.* Additionally, the ALJ noted that Dr. Cholankeril, Plaintiff's treating physician, opined that "despite his poorly controlled diabetes, [Plaintiff] was capable of lifting and carrying 50 pounds, he was limited for pushing and pulling, but . . . had no limitations for sitting, standing, and walking." *Id.* The above three bases for the ALJ's decision not to attribute specific restrictions resulting from Plaintiff's diabetes mellitus are of the type that a "reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S at 401 (citation omitted). Thus, said decision is based on substantial evidence.

---

[6] Plaintiff also contends that "there were absolutely no options available to the ALJ to deny plaintiff's application at step five." Pl. Br. at 9. Plaintiff attacks a straw man. The ALJ did not reach step five.

12

B.  Plaintiff's Shoulder and Lumbosacral Strains

Plaintiff argues that with regard to his "severe" shoulder strains, the ALJ did not specify "which shoulder is affected or what limitations to [his] shoulder moved the ALJ to consider his condition 'severe.'" Pl. Br. at 13. To the contrary, the ALJ specified that both of Plaintiff's shoulders are affected. R. at 18. The ALJ noted that Dr. Horwitz, an orthopedic examiner, "diagnosed repetitive stress and strain injuries to *both shoulders* . . . ." *Id.* (emphasis added).

The ALJ also adequately specified what limitations to Plaintiff's shoulders led her to find Plaintiff's condition "severe."[7] The inquiry into severity is a "*de minimis* screening device to dispose of groundless claims." *Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 546 (3d Cir. 2003) (citations omitted). An impairment is "severe" if "the evidence presented by the claimant presents more than a 'slight abnormality . . . .'" *Id.* (citation omitted). Here, the ALJ stated that Dr. Horwitz's "[p]hysical examination of [Plaintiff's] shoulders revealed evidence of tenderness and limitation of motion," providing a citation to Dr. Horwitz's report. R. at 18. That report noted that neither of Plaintiff's shoulders moved smoothly. R. at 318. Plaintiff's "[right] [s]houlder motion lack[ed] 20 degrees in elevation, 15 degrees in external rotation and 15 degrees in internal rotation . . . ." *Id.* Similarly, Plaintiff's "[left] [s]houlder motion lack[ed] 20 degrees in elevation, 10 degrees in external rotation and 10 degrees in internal rotation . . . ." *Id.* Although the ALJ's decision did not explicitly note these limitations, the ALJ's statement about a "limitation of motion" in Plaintiff's shoulders, coupled with its citation to Dr. Horwitz's report, is sufficiently severe since it presents more than a "slight abnormality."

Plaintiff next contends that the ALJ's decision not to attribute any restrictions to Plaintiff's severe shoulder impairments lacked substantial evidence. Pl. Br. at 13. Plaintiff

---

[7] Why Plaintiff apparently seeks to disprove the severity of his shoulder impairments puzzles this Court because "[i]f a claimant is unable to show that he has a medically severe impairment, he is *not* eligible for benefits . . . ." *Bowen*, 482 U.S. at 138 (emphasis added).

13

alleges that the ALJ neither qualified nor rejected Dr. Horwitz's findings. *Id.* at 13-14. Not so. As explained below, the ALJ qualified Dr. Horwitz's findings and found that Plaintiff's shoulder impairments contributed to Plaintiff having a RFC for light work. R. at 18-19.

The ALJ noted that "neurological examination by Dr. Cholankeril, a treating medical source, was grossly intact with no significant weakness," and cited to Dr. Cholankeril's reports. *Id.* at 18. Some of these reports state that musculoskeletal examination revealed "[n]o deformities, no joint tenderness, [and] normal muscle tone and strength." *Id.* at 383-84, 449-52. Others merely state that Plaintiff had "[n]o muscle pain or swelling." *Id.* at 506-09, 527-30, 532-37. The ALJ also found it significant that Plaintiff has neither sought nor required "multiple inpatient hospital admissions, frequent hospital emergency room care, surgical intervention, the use of any potent narcotic analgesics for treatment of pain, any interventional pain treatment modalities, a protracted course of physical therapy or any other indicia of totally disabling low back and shoulder disorders." *Id.* at 18. "In considering a claim for disability benefits, greater weight should be given to the findings of a treating physician than to a physician who has examined the claimant as a consultant." *Adorno v. Shalala*, 40 F.3d 43, 47 (3d Cir. 1994). The ALJ did just that by granting greater weight to Dr. Cholankeril's reports—Dr. Cholankeril was Plaintiff's treating physician while Dr. Horwitz was a consultant. *See* R. at 18, 317-18. This Court is not empowered to second-guess that decision. *See Williams*, 970 F.2d at 1182 (explaining that district courts may not weigh the evidence in social security appeals). Accordingly, the ALJ's finding that Plaintiff has a RFC for light work, in part, because of Plaintiff's shoulder impairments is supported by substantial evidence.

As to Plaintiff's back injuries, Plaintiff argues that the ALJ mislabeled them as a "lumbosacral strain." Pl. Br. at 13. Plaintiff directs this Court to the MRI proof in the record

that he had herniated disc and disc bulges. *Id.* To the extent that Plaintiff implies that this purported mislabeling prevents the ALJ's decisional RFC from being based on substantial evidence, the Court is unconvinced. As a threshold matter, Plaintiff did have a lumbosacral strain. *See* R. at 317-18 (diagnosing Plaintiff with "residuals of repetitive stress and strains to the lumbosacral region"). More importantly, Plaintiff's argument misses the point. In reviewing the ALJ's decision, this Court is concerned with whether she "show[ed] [her] full engagement in the evidence-weighing process." *Facyson v. Barnhart*, 94 Fed. App'x 110, 114 (3d Cir. 2004) (citations omitted). As Plaintiff admits, the ALJ noted that the MRI proof "demonstrated signs of degenerative disc disease and a bulging disc at the L4-5 level, a 'small' herniated disc at the L4-5 level and a 'mild' disc bulge at the L5-S1 level . . . ." R. at 18. The ALJ's decision goes on to qualify the MRI proof in light of Dr. Cholankeril's reports, which this Court discussed in the preceding paragraph. *Id.* Thus, the ALJ did not "take bits and snatches of the [medical evidence] out of context . . . ." *Daring*, 727 F.2d at 70. Instead, as the substantial evidence standard requires, the ALJ read the evidence in its totality. *Id.* Consequently, the ALJ's finding that Plaintiff's back injuries contributed to Plaintiff's RFC for light work is supported by substantial evidence.

C. <u>Plaintiff's Depression</u>

Plaintiff contends that the ALJ's findings concerning the non-exertional restrictions stemming from Plaintiff's depression are not based on substantial evidence. *See* Pl. Br. at 14-16. These findings are that Plaintiff: (1) "is limited to work that can be learned in 1 month of [sic] less and that involves simple instructions; (2) "is limited to work that involves no contact with the general public;" (3) "can work in proximity with co-workers, but cannot work with them;" and (4) "can have contact with supervisors up to 1/3 of the day." R. at 17. Said findings are not

based on substantial evidence, according to Plaintiff, because the ALJ "ignores, minimizes or omits much of the treating psychiatric evidence . . . ." Pl. Br. at 16-17. The Court agrees.

Trinitas treated Plaintiff's depression from July 2008 to June 2011. *See* R. at 331-41, 500. The intake assessment prepared by Trinitas in July 2008 assigned Plaintiff a GAF rating of fifty. *Id.* at 341. The intake assessment noted that Plaintiff was having homicidal and suicidal ideations, and had a suicidal plan at that time. *Id.* at 338-39. During the course of Plaintiff's treatment with Trinitas, Trinitas reported that Plaintiff had "vague" suicidal ideations in March, April, September, and November 2009. *Id.* at 400-01, 405-06. On May 20, 2010, Plaintiff was admitted into Trinitas Regional Medical Center with depressive symptoms and suicidal ideation. *Id.* at 471-72, 476. Trinitas assigned Plaintiff a GAF rating of twenty-five at that time. *Id.* at 477.

The facts in the preceding paragraph directly contradict the ALJ's statement that "the claimant's own treating psychiatrist, who saw him from July 2008 to June 29, 2011, found that . . . he had no homicidal or suicidal ideation . . . ." *Id.* at 19. They also contradict the Commissioner's assertion that "Plaintiff's own treating psychiatrist, who saw him from July 2008 to June 29, 2011, . . . indicated . . . that he had no homicidal or suicidal ideation . . . ." Def. Br. at 12. The ALJ's mistaken belief that Plaintiff did not have any suicidal or homicidal ideations contributed to her rejection of the GAF rating assigned by Trinitas. *See* R. at 19 ("although his therapist issued several notes indicating that the claimant is 'sometimes' confused with impaired concentration, I find that this intermittent condition does not support the finding of a GAF . . . scale test score of 50 or 55 as noted by his therapist . . . ."). The Third Circuit has clarified that when the evidentiary basis of an ALJ's decision is mistaken, the ALJ's rejection of evidence is unsound. *Smith v. Califano*, 637 F.2d 968, 972 (3d Cir. 1981) ("Because the

evidentiary basis for his decision was not what he believed it to be, the ALJ's rejection of Plaintiff's assertions of disabling pain was unsound."). Moreover, even if mistaken, "[t]he ALJ cannot ignore evidence of a mental impairment in the record . . . ." *Plummer*, 186 F.3d at 432; *see also* 42 U.S.C. § 423(d)(5)(B) (Commissioner must consider all evidence available in an individual's case record in making a disability determination). Here, the ALJ's mistaken belief makes her assertion that "the residual functional capacity finding is supported by the totality of the evidence" unsound, bringing her ruling into question.

The ALJ's failure to discuss other contradictory medical evidence related to Plaintiff's depression is also problematic. *See Adorno*, 40 F.3d at 48 (setting aside an ALJ determination for failing to mention and refute some of the contradictory medical evidence before him). For instance, the ALJ's decision makes no mention of the medication Plaintiff used to treat his depression, Plaintiff's insomnia, or his auditory hallucinations. *See* R. at 18-19. On remand, the ALJ must review this "pertinent medical evidence, explaining his conciliations and rejections." *Burnett*, 220 F.3d at 122.

Another defect in the ALJ's decision is that this Court cannot decipher why she found that Plaintiff: (1) "is limited to work that can be learned in 1 month of [sic] less and that involves simple instructions; (2) "is limited to work that involves no contact with the general public;" (3) "can work in proximity with co-workers, but cannot work with them;" and (4) "can have contact with supervisors up to 1/3 of the day." R. at 17. An ALJ has an obligation "to provide an adequate basis so that the reviewing court can determine whether the administrative decision is based on substantial evidence." *Cotter v. Harris*, 642 F.2d 700, 706 (3d Cir. 1981). The ALJ has not provided such a basis and, thus, this Court cannot assess whether her decision is based on substantial evidence. Further explanation is required.

## IV. CONCLUSION

The Court finds, for the reasons discussed above, that the ALJ's findings concerning the non-exertional restrictions resulting from Plaintiff's depression are not based on substantial evidence. The decision of the ALJ is hereby remanded for further discussion consistent with this Opinion. An appropriate order accompanies this Opinion.

DATED: August 22, 2013

JOSE L. LINARES
U.S. DISTRICT JUDGE